Niemes v. Niemes.

# WILLS.

[Hamilton (1st) Court of Appeals, February, 1917.]

Jones, Jones and Gorman, JJ.

HENRY NIEMES ET AL. v. TILLIE NIEMES ET AL.

1. **The Words, "Misrepresentation," "Deception," "Coercion," "Threats" in Instructions Held Prejudicial in Will Contest.**

   The use of such words as "misrepresentation," "deception," "coercion," "threats," in instructions to the jury in a proceeding to contest a will, is prejudicial, in the absence of evidence upon which the use of such words might fairly be inferred.

2. **Porters, Janitors, Waiters, Incompetent Witnesses to Show Mental Disability of Deceased Employer to Make Will.**

   While the testimony of a family physician as to the ability of testator to understand and decide large and complicated business propositions is competent in a will contest proceeding, the rule is otherwise as to like evidence by lay witnesses such as porters, janitors and waiters, employees about his place of business. **Bahl v. Byal, 90 Ohio St. 129, distinguished.**

*J. Louis Kohl* and *Peck, Shaffer & Peck,* for plaintiffs in error.

*Rufus B. Smith, Cogan, Williams & Ragland, Horace A. Reeve* and *John J. Weitzel,* for defendants in error.

**JONES (E. H.), J.**

This court is unanimous in the opinion that the judgment of the court below should be reversed, but we are not in agreement as to the grounds upon which our judgment shall be based.

The majority of the court is of the opinion that the third and fourth grounds of reversal as designated in the separate concurring opinion are well taken. We find error in the charge and in the admission of evidence which is prejudicial and which, therefore, makes for a reversal of the judgment.

In a separate opinion our associate goes further and favors reversal not only for these reasons, but upon all the grounds contended for by plaintiffs in error.

While unwilling to say with him that the judgment below is manifestly against the weight of the evidence or that there is no evidence of undue influence, it must be admitted that the fact that the court is thus divided upon these questions shows at least some infirmity in the proof and that these are questions upon which the minds of men may and indeed do differ.

Such being the situation confronting the learned judge who presided at the trial, it became his duty in charging the jury

to avoid a departure from the evidence or, rather, to confine him-
self to the law applicable to the facts brought out or supported
by evidence adduced during the trial. This was not done, when
the court in its general charge said:

"If, however, there is a preponderance of the evidence show-
ing * * * that said instrument was executed by John Nie-
mes while under the undue influence of defendants, or any of
them, then said instrument should be declared to be not the last
will and testament of John Niemes." * * * * * * *

"The exercise of undue influence need not be shown by direct
proof. It may be inferred from circumstances; but these cir-
cumstances must be shown by the evidence and be such as to
justly lead to the inference that undue influence was employed
and the will was not the wish or intention of the testator. * *
* If deceived by misrepresentations or coerced by threats or
solicitation or persuasion, or even by mercenary kindness or
attentions, or influenced by the constant pressure of a dominating
or controlling mind which constrained him into executing a will
he would not of his own inclination have made, then the jury
may find that undue influence has been exerted over the mind
of the testator."

There is no evidence of misrepresentation or deception, coer-
cion or threats. It was error to use such words in the absence
of evidence upon which to base them. As to the probable effect
of an unwarranted charge of this kind upon the jury, we fully
agree with the following from the brief of counsel for plaintiffs
in error:

"When the presiding judge thus states in detail contingen-
cies upon which the will may be set aside, the jury is entitled
to infer that he is speaking of something, the existence of which
the jury is at liberty to infer from the evidence under consid-
eration. The jurors do not accept such a charge as an abstract
lecture on the subject of undue influence in general. On the
contrary, it is supposed to be given and is accepted in the con-
crete, with strict application to the case in hand, and where
the judge speaks of the possibility of 'coercion, threats, misrep-
resentation and deceit,' they certainly think they have a right
to go as far as he and 'infer from circumstances' that some of
those vicious elements produced the will in question."

It is such a well settled principle, that courts must limit the charge to the facts which the evidence tends to establish, that we deem citation of authorities unnecessary.

We are of the opinion, also, that the court erred in permitting a number of lay witnesses to testify as to the lack of ability of the testator "to understand and decide large and complicated business propositions." Questions of such import were asked numerous lay witnesses, and answers given, over objection by the defendants. The porters, janitors, etc., employed in and about testator's saloon, were permitted·to say to the jury that in their opinions Mr. Niemes could not understand and decide large and complicated business transactions.

It is claimed that our Supreme Court has decided such evidence to be admissible in *Bahl v. Byal, et al*, 90 Ohio St., 129 [106 N. E. 766]. The portion of the syllabus relied upon reads thus:

"It is competent for the physician of a testator to express an opinion as to the actual condition of his patient's mind, founded on his study and observation of the testator while in professional attendance on him at the time and prior to the date of the will, and whether he was capable of comprehending large and complicated business propositions or the distribution of a large estate."

We also quote from the opinion, page 135:

"Preceding the questions and answers referred to, the physician had testified to his complete knowledge of, and acquaintance with, the physical and mental condition of Mr. Byal covering a period of about fifteen years prior to this death. This knowledge had been obtained by the study of those conditions while in the performance of his duties as the physician of testator during that period and through the close association and complete opportunity which follow that relationship. In that testimony the doctor had fully described the gradual, well-defined and constant decline in the mental and physical powers of the testator after the year 1900, due to the influences of extreme old age, the effects upon his nervous system of different attacks of sickness and of painful and exhausting operations on his eyes."

And from page 137:

"The last three questions differed from those that preceded them in that they inquired for the opinion of the doctor as to the capacity of the testator based upon the knowledge which the doctor himself had of his mental and physical condition, all of which he had fully detailed in the preceding parts of his evidence. He was asked to take into consideration the diseased and enfeebled condition of the testator, both mentally and physically, as he had already described it, and to give an opinion as to whether he was capable of understanding and deciding large and complicated business propositions, and the division and distribution of an estate valued at about $70,000. It called for his opinion as an expert, based on facts within his own knowledge and as to which he had testified, concerning the capacity of the testator to comprehend the matters referred to. This was an evidential fact, proper to be given to the jury as evidence, to be considered by them along with all the other evidence in the case in the determination of the ultimate question at issue."

It is true that the question propounded to the family physician in the above case was the same question asked the employees and acquaintances of testator. But in other respects there is a vast difference. The Supreme Court, in *Bahl* v. *Byal, supra,* bases its opinion, holding the evidence admissible, upon the fact that the witness had been for fifteen years the physician of the testator, and that the question and answer were preceded by a long examination of the doctor during which he had detailed the gradual decline of his patient into a condition of enfeebled body and mind.

We do not think the rule established in that case should be extended so as to apply to the very different character of testimony allowed by the trial court in the instant case.

For these reasons the judgment will be reversed, and a new trial granted.

Jones, (O. B.), J., concurs.

Gorman, J., concurring.

I concur in the conclusion reached by the majority of the court that the judgment must be reversed, not only for the reasons assigned in the opinion of the majority, but for the following additional reasons:

Niemes v. Niemes.

It appears from the record in the case that John Niemes owned and conducted a saloon, restaurant and billiard hall on the south side of Fifth street just west of Vine, in Cincinnati; that he had carried on that business there for several years and had accumulated quite a competence. He had in his employ from fifteen to twenty persons—bookkeepers, bartenders, waiters, cooks, dishwashers and others—and he served a great number of people with meals every day. The receipts of his business approximated $300 a day or about $100,000 a year. The business required close attention, application and considerable ability, and Niemes manifested a peculiar and special ability to conduct a cafe and saloon. He had been suffering for some time from stone in the kidney, and on January 20, 1913, he decided to go to the hospital and have an operation performed for its removal. On this day, previous to going to the hospital, he executed his will. The record discloses that he had under consideration the execution of his will for some time prior to the date of its execution—the period extending back as far as August, 1912. The operation upon him was performed at Christ Hospital on the day following the execution of the will, January 21, 1913. A second operation was performed on him in February, from the effects of which he died on the 17th of March, 1913, about two months after the execution of the will.

The plaintiffs in error, who are the representatives of his deceased mother, the brothers, the nieces and nephews of John Niemes, claim that there is error apparent on the face of the record in this, to-wit: *first,* that the verdict of the jury and the judgment of the court are manifestly against the weight of the evidence; *second,* that there was no evidence of undue influence offered in the trial of the case and that therefore this question should have been withdrawn from the consideration of the jury; *third,* that the court erred in charging the jury upon the question of undue influence in the absence of evidence tending to support such question; and also in the general charge and in the giving and refusal of special charges; *fourth,* that the court erred in the admission of evidence objected to at the time by counsel for plaintiff in error.

A great number of witnesses were offered by the contestant

and the proponents of the will. No physicians were called by the contestant to testify as to the mental condition of John Niemes, at, before or after the time he executed the will. The physician attendant at his last illness, and the physicians who called upon him on one or two other occasions, testified that he was mentally sound. The nurses who attended him at the hospital during the period of almost two months, testified that he was mentally sound. Other persons connected with the hospital who came in contact with Niemes and had occasion to observe him, testified that he was mentally sound. The witnesses to the will, both lawyers, testified that he was mentally sound at the time he executed the will. Many other witnesses who were called, who had occasion to observe Niemes from time to time covering a considerable period prior to the execution of the will, all testified that he was mentally sound and capable of making a will.

Many witnesses were called by the contestant, among them being waiters, bartenders and others who had been employed by Niemes in his business. Most, if not all, of these witnesses testified that in their opinion Niemes was not mentally sound. Their judgment was based upon their observation of him. They testified that at times he was nervous and not interested; absent-minded; would abruptly leave people; would forget things very readily; that he would discharge some of his people and re-employ them; that he had arguments with people, and many other incidents were recited upon which they based their opinions as to his mental capacity.

I am of the opinion that when the presumption of law that the probating of a will makes it a *prima facie* case as to its validity, is added to the testimony of the physicians who waited upon him, the nurses who attended him, the witnesses who attested the will—in opposition to the testimony of persons who were not in as good a position to observe Niemes' mental condition, the verdict of the jury is manifestly against the weight of the evidence. It appears to me that the jury undertook to substitute its will and its judgment for that of John Niemes, and that because the will was not such as the jury would have made, they conceived it to be their province to set aside the will. I am of the opinion that the testator should be the one to make his will and not a jury, as appears to have been done here.

Niemes v. Niemes.

Furthermore, I think the record shows that there is not a scintilla of evidence in this case tending to show undue influence. It is true that the brothers, Henry Niemes and Jacob Niemes, are beneficiaries under the will, and it was charged by the contestants that the testator had been unduly influenced by Henry and Jacob Niemes, and by Louis Kohl, the attorney who drew the will. There is no evidence whatsoever that Jacob or Henry Niemes, or Louis Kohl, exerted any undue influence, or any influence whatsoever to induce John Niemes to execute this will. There is evidence by Mrs. Niemes, the contestant, and a friend of hers, Mrs. Hobson, that John Niemes had said on one or two occasions that his brother Jake, who lived in Chicago, had asked him to make a will and that he had said he didn't see any reason for making a will. There is also evidence tending to show that Jacob Niemes knew of John's intention to make a will and that he was present on one or two occasions when John discussed his will with his attorney, Louis Kohl. Manifestly, this is not evidence of undue influence. Under the law, one may influence another to make a will in his favor if he so desires, provided he does not make any false representations or practice impositions upon him to induce him to make a will, in substance perpetrating a fraud upon the testator. But there is no evidence in this case, or any circumstances, from which undue influence could be found or inferred. The mere fact that Jacob and Henry Niemes are beneficiaries under the will does not even tend to establish undue influence. They were his brothers, and it would appear to be perfectly natural for him to remember them in his will; nor can any presumption or inference of undue influence be drawn from the fact that they are beneficiaries under the will; nor could any presumption of undue influence be drawn from the fact that they were in a position to have unduly influenced him.

Counsel for defendants requested the court to give several special charges which tended to eliminate from the minds of the jury the question of undue influence. These special charges, numbered 1, 2, 3 and 4, were refused. In refusing to give them, it appears to me that the trial court erred. These charges were all to the effect that there was no evidence in the case that the paper writing purporting to be the last will and testament of

John Niemes was executed while he was under restraint or undue influence and therefore the jury were not to consider the question of undue influence in determining whether or not the paper writing submitted to them was the last will and testament of John Niemes. If there was no evidence of undue influence, there should have been no charge touching this question.

It has been urged that in view of the fact that there were two issues in the case, to-wit, the mental capacity of John Niemes to make a will, and the question of undue influence exerted upon him, the fact, if it be a fact, that it was error on the part of the trial court in refusing to give the special charges and in incorporating in his general charge the question of undue influence, was not prejudicial to the plaintiffs in error because, *non constat*, the jury may have found that the paper writing was not the last will and testament of John Niemes because of his mental incapacity.

But there were not two issues in the case. There was only one issue, and that was whether or not the paper writing was the last will and testament of John Niemes. It was not the last will and testament of John Niemes if he did not have mental capacity to make a will, or if he was unduly influenced to make the will. The reasons or grounds upon which the jury were to determine whether the paper writing was or was not John Niemes' will were the facts as to his mental capacity, and undue influence; but these facts do not constitute the issues in the case, and therefore the rule invoked by counsel for defendants in error that even though there was no undue influence shown, nevertheless the verdict and judgment should stand because on the other issue, to-wit, mental capacity, the jury were warranted in setting aside the will, does not hold.

If there was no evidence of undue influence and the court charged the jury upon that question, it is impossible for this court or any other court to say that the jury did not return a verdict setting aside the will on the ground of undue influence. It was error to refuse to give these special charges, and it was error to give the general charge as given; and these errors were prejudicial, and being prejudicial, the verdict should not stand.